## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**MICHAEL BALICE,**

**Defendant.**

Civ. No. 14-3937 (KM)(JBC)

**OPINION**

The United States believes that Michael Balice has failed to pay certain federal tax liabilities. It has filed suit seeking two forms of relief: First, it wishes to reduce to judgment Balice's tax liability for several years; second, it wishes to foreclose on a property at 70 Maple Avenue in Metuchen, New Jersey. Also named as defendants are five parties that may have an interest in the Maple Avenue property: two banks that hold mortgages and three judgment creditors.

Now before the Court are three sets of motions, some sixteen in all.

First, one of the banks, Amboy, has moved for summary judgment, arguing that its lien on the Maple Avenue property has priority over the federal government's tax lien. (Dkt. No. 33) Amboy's motion will be denied, because the record is undeveloped. Nevertheless, some useful legal principles may be stated to guide the progress of the case. Amboy's lien has priority over the tax lien of the United States to the extent of the outstanding balance on the home equity line of credit as of July 12, 2005, plus any additional sums advanced thereafter, but before August 27, 2005. The amount of the lien, however, cannot be determined on summary judgment, and may require additional discovery. Ultimately, the dollar amount will depend on such issues as the outstanding loan disbursements before August 27, 2005, reduction of that balance by repayment, and interest and fees. (*See* Part I, *infra.*)

1

Second, Balice has filed motions to dismiss on the basis of res judicata (Dkt. No. 6), and the United States' alleged lack of constitutional authority to collect income taxes. (Dkt. Nos. 7, 8, 26, 27, 36, 47, 49) He has also filed a motion for "due process" (Dkt. No. 14), requesting that the prison where he is incarcerated grant him additional telephone access to aid him in defending this case. He has moved for what he describes as a default judgment against the United States. (Dkt. Nos. 47, 49) He has objected (Dkt. No. 66) to the assignment of a Magistrate Judge to this case. He has objected (Dkt. Nos. 68 & 70) to what he describes as the government's motion for time to submit a motion for summary judgment. And he has objected (Dkt. No. 69) to what he characterizes as *ex parte* communications between the government and other defendants. All of Balice's motions will be denied. (*See* Parts II - VII, *infra.*)

Third, the United States has moved for a default judgment against three non-responsive defendants. (Dkt. No. 52) That motion will be granted as to defendants Richard Tiedemann and Medical Care Management System, but denied as to The Rosewater Trust. Balice's related objection to the Clerk's entry of defaults (Dkt. No. 58) is denied. (*See* Part VIII, *infra.*)

## Background

The United States alleges that the defendant, Michael Balice, owes some $359,752 in unpaid federal taxes and penalties. That total includes:

1. $ 95,003.74 for the tax period ending December 31, 1998 (Compl.[1], ¶¶ 17, 20)

---

[1] Citations to the record will be abbreviated as follows:

"Amboy Answer" – Answer and Separate Defenses of Defendant Amboy Bank, Dkt. No. 9.

"Amboy Mot." – Memorandum of Law in Support of Defendant, Amboy Bank's Motion for Summary Judgment, Dkt. No. 33-2.

"Balice Answer" – Defendant's Answer to Complaint Denied Trial By Jury Demanded, Dkt. No. 5.

"Chesler Order" – United States of America v. Marion Balice, No. 11-cv-130, Opinion, Dkt. No. 45. In the docket for the instant case, this opinion is reproduced at Dkt. No. 11-3.

"Compl." – Complaint, Dkt. No. 1.

    2. $ 16,948.98 for the tax period ending December 31, 2005 (Compl., ¶¶ 22, 25)

    3. $ 247,799.04 for the tax years 1992, 1993, 1996, and 2001. (Compl., ¶ 40, 46)

For tax periods 1998 and 2005 (*i.e.,* paragraphs 1 and 2, *supra*), the government seeks to reduce the tax assessments to judgment. (Compl., Counts I and II) For tax periods 1992, 1993, 1996, and 2001 (*i.e.,* paragraph 3, *supra*), the government had already obtained judgments against Balice before filing this action. (Compl., ¶¶ 41 and 43)

To satisfy the existing and anticipated judgments, the government seeks to foreclose on a property at 70 Maple Avenue in Metuchen, New Jersey. That Maple Avenue property was once owned by Michael Balice and his then-wife, Marion Balice.[2] In 1994, the Balices transferred ownership of the Maple Avenue property to a trust called The Rosewater Trust; the government alleges that they did so for no consideration, in an attempt to frustrate creditors. The government therefore asks this court to either hold that the Trust is an alter ego of Michael Balice (Count III) or deem the transfer to be a fraudulent conveyance or a fraud on the United States (Count IV). In any case, the government wishes to foreclose on the Maple Avenue property in satisfaction of Balice's tax obligations. (Count V).

Two defendants—Investors Bank and Amboy Bank—hold mortgages on the Maple Avenue property. (Compl., ¶¶ 8, 9)

---

"Credit Agrmt." – Home Equity Ready Credit Agreement, Dkt. No. 33-4,
"Hochberg Order" – United States v. Michael Balice, No. 07-cv-5326 (D.N.J.), Opinion & Order, Dkt. No. 10, (June 17, 2008). In the docket for the instant case, this order is reproduced at Dkt. No. 11-2.
"Investors Answer" – Answer and Affirmative Defenses of Defendant Investors Bank, Dkt. No. 39.
"Koreyva Cert" – Certification of Stanley Koreyva, Jr., Dkt. No. 33-3.
"Mortgage" – Open End Line of Credit Mortgage, Dkt. No. 33-5.

[2]    Michael and Marion Balice have apparently divorced, and Marion is currently using the surname Meyer. For convenience, however (and because many of the events related herein took place when the two were married), I will sometimes refer to them as "the Balices." "Balice," unless otherwise specified, refers to defendant Michael Balice.

Three other defendants—Medical Care Management Systems, Barclays Bank Delaware, and Richard Tiedemann—are creditors who had previously recorded judgments against Balice. (Compl., ¶¶ 10-12). Barclays has filed a stipulation indicating that it has no interest in the property. (Dkt. No. 45) Medical Care and Tiedemann have not appeared.

Also named as a defendant is Balice's former wife, Marion Balice (now Marion Meyer). She has entered into a consent judgment and is no longer a party. (Dkt. No. 55)

## I.   <u>Amboy Bank motion for summary judgment (Dkt no. 33)</u>

### a. **Background and summary**

On March 2, 1991, Amboy Bank issued a home equity line of credit ("HELOC")[3] to Michael and Marion Balice. (Credit Agrmt., 1) The line of credit had a limit of $35,000. (Credit Agrmt., 1) As security for the line of credit, the Balices executed and delivered to Amboy a mortgage on their Maple Avenue property. Amboy's mortgage was recorded on March 12, 1991. (Mortgage, 1)

Fourteen years later, on July 12, 2005, the federal government filed its first notice of a tax lien on the Maple Avenue property. (Compl., ¶ 45)

The question that Amboy's summary judgment motion raises is this: If the government succeeds in foreclosing on the Maple Avenue property, will

---

[3]    A home equity line of credit is defined as follows:

A line of credit extended to a homeowner that uses the borrower's home as collateral. Once a maximum loan balance is established, the homeowner may draw on the line of credit at his or her discretion. Interest is charged on a predetermined variable rate, which is usually based on prevailing prime rates.

Once there is a balance owing on the loan, the homeowner can choose the repayment schedule as long as minimum interest payments are made monthly. The term of a HELOC can last anywhere from less than five to more than 20 years, at the end of which all balances must be paid in full.

www.investopedia.com/terms/h/homeequitylineofcredit.asp (visited July 2, 2015).

Amboy's lien take priority over the federal tax lien? Amboy's position is a maximalist one, founded on New Jersey law: It believes that its lien was perfected, in the full amount of $35,000, in 1991; that any amounts advanced on the HELOC at any time thereafter relate back to 1991; and that Amboy's lien therefore primes the government's 2005 tax lien.

I understand the law of priority differently. Amboy's lien will take priority to the federal tax lien only to the extent that Amboy disbursed funds to the Balices prior to the 46th day following the filing of the notice of a tax lien. The amount of Amboy's lien that will take priority would therefore include: 1) the amount of cash disbursed to the Balices before the cutoff date, 2) plus any interest or fees attributable to that balance. In a proper case, the United States may argue that the amount of the lien should subtract 3) any repayment of the pre-cutoff-date debt.

To determine what portion of the amount that the Balices owe to Amboy Bank meets these criteria, discovery will be required. Summary judgment is therefore not appropriate at this juncture. My reasoning follows; although summary judgment is denied, I believe the case will benefit from a clear statement of the priority ground rules.

### b. Priority standards

#### 1. Federal standards govern the priority of federal tax liens

To a great extent, the dispute between Amboy and the government comes down to a choice of law issue. Amboy says that New Jersey law determines the order of priority of liens; the United States says that federal standards control. On that narrow question, the United States is correct. While state law governs the parties' underlying property rights, federal law governs the priority between a federal tax lien and a competing lien. *See Cong. Talcott Corp. v. Gruber*, 993 F.2d 315, 319 (3d Cir. 1993) ("Courts must apply state law to determine what interest, if any, the taxpayer has in levied property. Although state law governs this issue, as we have noted, federal law assigns consequences to rights created by local law.").

5

*Aquilino v. United States*, 363 U.S. 509 (1960) illustrates the distinction. There, the government filed a tax lien against all of a taxpayer's property. *Aquilino*, 363 U.S. at 510. Ten days later, a subcontractor filed a mechanic's lien on the same property to secure a fee of $2,200. *Id.* The Supreme Court explained that the subcontractor's interest in the $2,200 was governed by state law. Likewise, state law governed the taxpayer's ownership interest in the property. *Id.* at 512-13 ("it has long been the rule that in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property sought to be reached by the statute.")

Federal law, in contrast, governs the priority as between a tax lien and other liens: "[O]nce the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's property or rights to property." *Aquilino*, 363 U.S. at 513-14. *See also In re Wind Mach. Sales & Serv., Inc.*, 161 B.R. 1000, 1010 (Bankr. E.D. Cal. 1993) ("While state law determines the nature of property rights, federal law determines issues of priorities in relation to competing claims.")

It follows that, in a federal tax case, federal law regarding the priority of liens trumps state priority law. *See U.S. By & Through I.R.S. v. McDermott*, 507 U.S. 447, 449 (1993) (applying federal rules of priority to determine whether a federal tax lien took priority over a private lien that predated the tax lien); *Aquilino*, 363 U.S. at 510 (holding that federal law is used to determine whether a competing lien has priority over a federal tax lien); *Monica Fuel, Inc. v. I.R.S.*, 56 F.3d 508 (3d Cir. 1995) (applying federal law of priority to determine whether a state tax lien or a federal tax lien would enjoy priority); *In re B & B Printing Co., Inc.*, 164 B.R. 273, 276 (Bankr. S.D. Ohio 1993) ("The case before the Court involves competing liens of the federal government and a private party asserting rights under state law. Federal law, decided in *New Britain*, *Pioneer American*, and *McDermott*, is controlling.").

6

Under federal law, priority is determined according to the familiar principle that first in time is first in right. *McDermott*, 507 U.S. at 449 ("Federal tax liens do not automatically have priority over all other liens. Absent provision to the contrary, priority for purposes of federal law is governed by the common-law principle that the first in time is the first in right.") (internal quotations omitted); *Monica Fuel*, 56 F.3d 508. But the federal statute is a bit more specific than that. Under 26 U.S.C. § 6321, a tax lien arises when tax is assessed. Such a tax lien is not valid as against a competing "security interest," however, until notice of the tax lien is given—generally, by recordation with the county clerk. *See* 26 U.S.C. § 6323(f). As of the date of the tax lien's recordation (subject to a 45-day grace period, discussed below), only an earlier "security interest" will be given priority.

To the extent the Amboy lien is prior in time to the federal tax lien, then, it is prior in right. The date of a lien sounds like a simple, ascertainable fact, and it often is—but not always. I next discuss, under federal priority standards, the priority date of the Amboy lien in relation to the federal tax lien.

## 2. The priority date of the Amboy lien

I next consider the priority date of the competing Amboy lien, in order to ascertain whether it was earlier than the tax lien. Amboy takes the maximalist position that, under New Jersey state law, its lien in connection with the HELOC gained priority as of March 12, 1991,[4] when Amboy recorded it. That priority date, says Amboy, applies irrespective of any amounts that were or were not disbursed and outstanding at any later time. *See* Amboy Mot., 7. Because the federal tax lien was not recorded until fourteen years later, on July 12, 2005, it is second in time, and in right.

Were this an ordinary home mortgage, Amboy's simple approach would be the correct one: Homebuyer obtains a purchase money mortgage for $100,000, and the funds are immediately disbursed; Mortgagee bank records

---

[4]     Amboy's brief repeatedly cites that 1991 date, but also twice refers to the date as March 12, 1994, which I take to be an error. (Amboy Mot., 6)

the $100,000 mortgage on January 1, 2000; January 1, 2000, becomes the priority date for the mortgagee's lien on the property.

Not so straightforward in the case of a HELOC. There, the lien floats, in the sense that it secures whatever sums may be disbursed and outstanding from time to time on the credit line. The homeowner may never draw on the line of credit at all; the homeowner may draw on it temporarily but pay off the balance; or the homeowner may owe on the line of credit at the time the government's tax lien is filed. It is difficult to say that a HELOC loan (or the corresponding lien) has a fixed amount, or any amount, except in reference to a particular date.

The short answer to Amboy's maximalist position is that it rests on New Jersey State priority law, which does not apply.[5] As established above, priorities with respect to a federal tax lien are governed by federal law. And federal law supplies an answer to the question of whether, when, and to what extent Amboy's lien has priority. That answer is clear, if somewhat convoluted, but it ultimately depends on facts not before this Court.

Under applicable federal law, the priority date of a competing lien is the date that it becomes *specific* and *perfected*. That means that "the identity of the lienor, the property subject to the lien, and the amount of the lien [must be] established." *McDermott*, 507 U.S. at 449. Thus a lien is perfected, for purposes

---

[5] Amboy cites N.J. Stat. Ann. § 46:9-8.2, which provides:

> Notwithstanding any other law to the contrary, the priority of the lien of a mortgage loan which has undergone a modification, as defined by this act, shall relate back to and remain as it was at the time of recording of the original mortgage as if the modification was included in the original mortgage or as if the modification occurred at the time of recording of the original mortgage.

Amboy also cites a case in which a New Jersey court found that the holder of a line of credit enjoyed priority over a subsequent creditor, even though the holder did not disburse any cash until after the subsequent creditor recorded its mortgage. *See Goldome Realty Credit Corp. v. Harwick*, 564 A.2d 463, 466-67 (N.J. Super. 1989). I take no position on whether Amboy's argument is correct as a matter of state priority law; it is federal law that I must apply here.

of its priority vis-à-vis a federal tax lien, when there is "nothing more to be done":

> As against a record federal tax lien, the relative priority of a state lien is determined by the rule "first in time is the first in right," which in turn hinges upon whether, on the date the federal lien was recorded, the state lien was specific and perfected. A state lien is specific and perfected when there is nothing more to be done—when [1] the identity of the lienor, [2] the property subject to the lien, and [3] the amount of the lien are established.

*United States v. Equitable Life Assur. Soc. of U.S.*, 384 U.S. 323, 327-28 (1966) (bracketed [numbers] added for clarity). *Accord Monica Fuel*, 56 F.3d at 511.

As to Amboy's lien, "[1] the identity of the lienor" and "[2] the property subject to the lien" were indeed established as of March 12, 1991, when the lien was filed. But "[3] the amount of the lien" was contingent on future events. Amboy's HELOC gave the Balices the option to withdraw up to $35,000.[6] (Credit Agrmt., 1) Unless and until the Balices actually did so, the "amount of the lien" was effectively zero.[7] There was no debt for the mortgage to secure. But if, for example, the Balices borrowed $10,000 on the HELOC, that amount would be secured by the equity in their home. In short, the amount of the lien, at any given time, was equal to the amount disbursed and outstanding on the line of credit. In 1991, there was no way to know if there would ever be any outstanding balance—let alone the amount of that balance at any particular time in the future. Until the Balices borrowed on the HELOC, the amount owed was uncertain; there was still something "more to be done"; the lien was not perfected for priority purposes. *See Equitable Life Assur. Soc.*, 384 U.S. at 327-28. Under a home equity line of credit, then, the amount of the debt does not

---

[6]     The mortgage agreement provides that the amount of the lien can exceed $35,000 if the interest and penalties bring the total balance above that amount. (Mortgage, 1) ("The mortgage will secure [Amboy's] line of credit to [the Balices] in the amount of Thirty-Five Thousand & 00/100 Dollars ($35,000.00) plus interest, or the amount of the line of credit outstanding.").

[7]     Actually, the Balices would owe a small annual fee of $35, even if they did not use the line of credit. (Credit Agrmt., 1) I set that aside.

become certain, and the accompanying lien does not become perfected, until the balance is known as of a particular date. [8]

So "perfection" of the lien is one lens through which to view the question. Another such lens is the statutory definition of a "security interest." That alternative form of scrutiny yields the same answer.

---

[8]     This approach is consistent with the United States Supreme Court's interpretation of federal priority law in other, closely related contexts.

Take, for example, a secured obligation to pay attorney's fees that remained contingent and unliquidated when the United States recorded its tax lien. In *United States v. Equitable Life Assur. Soc. of U.S.*, 384 U.S. 323, 327-28 (1966), a mortgage stipulated that a defaulting borrower would be responsible, not only for the balance of the secured loan, but for reasonable attorney's fees incurred in the collection process. *Equitable Life Assur.*, 384 U.S. at 326. There was no doubt as to the time sequence: the mortgage was filed first, the tax lien was filed thereafter, and the borrower defaulted after that, causing the creditor to incur attorney's fees. The United States stipulated that the creditor had priority over the tax lien with respect to the balance due on the mortgage. At the time of the tax lien, however, no attorney's fees were owed. "[T]he attorney's fee was undetermined and indefinite at the time the federal lien was recorded; nor had the fee been reduced to a liquidation amount." *Equitable Life*, 384 U.S. at 328. The Court held that because the amount of attorneys' fees was not established at the time that the tax lien was filed, the lien (insofar as it related to attorney's fees) was not then perfected and choate for purposes of federal priority. The lien (again, insofar as it related to attorney's fees) was perfected after the tax lien, and was therefore junior to the tax lien.

Or consider a floating lien that encompasses "after-acquired property." In *McDermott*, 507 U.S. 447, a creditor held a judgment lien against a debtor that extended not just to property that the debtor owned at the time the lien was recorded, but to any property the debtor "thereafter acquired during the existence of said lien." *Id.* at 448. After the lien was recorded, the government filed notice of a tax lien against the same debtor. *Id.* Thereafter, the debtor acquired additional property, which would be subject to the original lien. The Court was called upon to decide which lien took priority: the tax lien, or the original lien, as it related to the after-acquired property. *Id.* The Supreme Court held that because the "property subject to the lien" was not established until sometime after the tax lien was filed, the original lien was not "perfected" as to the after-acquired property at the time the tax lien was filed. *Id.* at 452-53. Therefore, the Court held, the federal lien took priority.

In the Balices' case, until a disbursement was made on the line of credit, any amount which the Balices would owe Amboy remained uncertain—just as the amounts remained uncertain in *Equitable Life,* and the property remained uncertain in *McDermott.* Thus, it seems consistent with *Equitable Life* and *McDermott* that a mortgage securing a line of credit is not choate for purposes of federal priority law until specific amounts are disbursed and outstanding on the line of credit. Only then does the lien become "specific and perfected."

Where, as here, a loan is disbursed over time, the issue of the priority date and the issue of the lien's dollar amount are intertwined. Section 6323(d), quoted above, provides that a tax lien shall not be valid as against "a security interest" that is prior in time. The same section defines a "security interest":

> The term "security interest" means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of any unsecured obligations, and (B) to the extent that, at such time, the holder has parted with money and money's worth.

26 U.S.C. § 6323(a).

Thus a competing lien qualifies as a "security interest" only "at such time" and "to the extent" that the holder has "parted with money and money's worth." "[M]oney" or "money's worth" are defined by regulation as "money…and other consideration reducible to a money value. Money or money's worth also includes any consideration…which was parted with before the security interest would otherwise exist…" 26 C.F.R. § 301.6323(h)-1(a)(3). By contrast, however, "[a] firm *commitment* to part with money…does *not*, in itself, constitute a consideration in money or money's worth." *Id.* (emphasis added).

In the case of a HELOC, the lender *commits* to part with money at the outset, but *actually* parts with money or money's worth only at the time, and to the extent, that it actually disburses funds. Thus Amboy's 1991 HELOC agreement was a *commitment* to advance funds to the borrower, but Amboy *actually* parted with money only later, when the Balices used the line of credit. Only "at such time," and "to that extent," did the Amboy lien qualify as a "security interest" for purposes of priority with respect to the tax lien. 26 U.S.C. § 6323(a).

The federal tax lien was filed as of July 12, 2005. Thus, at most, Amboy would have priority over the federal tax lien to the extent that Amboy had

11

disbursed money to the Balices prior to that date. This statement, however, is subject to two caveats: First, federal law establishes a grace period pursuant to which additional disbursements within 45 days after the filing of the tax lien may enjoy priority. *See* Part I.b.3, *infra*. Second, the amount of Amboy's lien will naturally be reduced to the extent to which the Balices repaid their debt. *See* Part I.b.4, *infra*. Third, there may be interest and fees. *See* Part I.b.4, *infra*. I turn to those issues.

### 3. The 45-day grace period

The date of filing of the federal tax lien (July 12, 2005) is not quite the final cutoff date for competing liens. Following the recordation of the tax lien, there is a 45-day grace period. During that 45-day period (to simplify a bit), the creditor may make additional advances under an already-existing, secured line of credit, and such advances will enjoy priority over the tax lien. *See* 26 U.S.C. § 6323(d). For those purposes, it is just as if the federal tax lien became effective on the 46th day after its recordation.[9] Here, the 46th day after the filing date of the federal tax lien is August 27, 2005.

---

[9]     Provided, of course, that the other statutory requirements are met. The statute provides as follows:

> Even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing by reason of disbursements made before the 46th day after the date of tax lien filing, or (if earlier) before the person making such disbursements had actual notice or knowledge of tax lien filing, but only if such security interest—
>
> > (1) is in property
> >
> > > (A) subject, at the time of tax lien filing, to the lien imposed by section 6321, and
> > >
> > > (B) covered by the terms of a written agreement entered into before tax lien filing,
> >
> > and
> >
> > (2) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

26 U.S.C. § 6323(d).

Amboy suggests that state law, not federal law, applies, because section 6323(d) is limited to "a security interest which came into existence after tax lien filing by

Surprisingly, I have found just one case that demonstrates the operation of the grace period with respect to a HELOC. In *Bank of America, N.A. v. Fletcher*, 342 F. Supp. 2d 1009 (N.D. Okl. 2004), a homeowner entered into a HELOC agreement with Bank. The line of credit was secured by a mortgage on the home, recorded in 1996. Homeowner twice drew on the line of credit, and paid it off. (Like the Balices, Homeowner then transferred the home into a revocable trust.) On October 30, 2000, the IRS filed a lien for back taxes. Sixty-seven days later, on January 5, 2001, Homeowner borrowed $25,000 on the line of credit. Further disbursements on the HELOC and further tax liens followed. Homeowner thereafter defaulted on the HELOC. The Bank and the IRS, who both sought satisfaction of their claims from the property, disputed the relative priority of their liens.

District Judge Cook first reviewed 26 U.S.C. §§ 6321, 6322, and 6323, including the definition of a security interest and the 45-day grace period, quoted above. Pre-tax-lien advances on the HELOC were not at issue, because they had been repaid, so Judge Cook considered loan disbursements that followed the recordation of the tax lien. As to these, Judge Cook wrote, the Bank would enjoy priority for 45 days, but "the Bank lost its priority lien status on December 15, 2000 which is the 46th day following the October 30, 2000, filing notice of the first tax lien on the real property here in question." *Id.* at 1012. Viewed from the government's perspective, "under the language of § 6323(d), the federal tax lien has priority over the mortgagee's security interest only as to the monies disbursed after the expiration of the 45–day grace period." *Fletcher*, 342 F. Supp. 2d at 1011. In *Fletcher,* all of the Bank's relevant disbursements on the HELOC occurred after the expiration of the 45-

---

reason of disbursements made before the 46th day after the date of tax lien filing...." *Id.* (*See* Amboy Mot., Dkt. 33-2 at 12.) I do not entirely follow. A lien that comes into existence by reason of, say, the property owners' draw on a line of credit shall be deemed prior to the tax lien, *even if* it post-dates the tax lien by 45 days (or less). That may or may not be the situation in an individual case, but the question of whether federal or state priority law applies is a separate one.

day grace period. The court therefore held that the tax lien had priority, and granted summary judgment to the United States.

Of particular interest was the district court's explanation of the underlying legislative rationale. As the court explained it, the 45-day grace period (although Amboy seems to be fighting it here) actually represents a relaxation of the strict "first in time" rule, in order to avoid unfair surprise to lenders:

> Prior to the 1966 amendment to the federal tax code, a lien for Federal taxes would arise when a taxpayer's liability was assessed. The lien attached to all of the property held by the taxpayer or subsequently acquired. The assessment was made when the unpaid tax liability was voluntarily entered on the tax forms filed by the taxpayer. Prior to the amendment, secured creditors were given priority over the tax lien only up to the time the IRS filed its tax lien in the county record's office. The amendment allowed for the 45–day grace period to provide an opportunity for a secured creditor to check the country records to determine whether a tax lien had been filed. Any advances made during the 45–day grace period were given priority over the tax lien. *See*, S. 1708 I. For priority to exist during the 45–day grace period, there must be a written agreement entered into before the tax lien filing and the security interest must be protected under local law against a judgment lien arising as of the time of the tax lien filing. *See*, S. 1708 II A(4). The 45–day grace period was "designed to make it unnecessary for the holder of a security interest to search the records more often than once every 45 days where one or more disbursements are to be made by him." *Id.*

342 F. Supp. 2d at 1012 (quoting S. Rep. No. 1708, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Admin. News, pp. 3722, 3729).[10]

---

[10]     Indeed, that 1966 Senate Committee Report specifically cited lines of credit as an example in its explanation of the new law, which enacted the 45-day grace period:

> In the case of inventory and accounts receivable financing, it is customary for a business, after establishing a line of credit, to receive advances from time to time as its needs arise. The security in such a case customarily is the inventory, accounts receivable, etc., which the business receives from time to time in the ordinary course of its business. The loan may be secured by these assets (including replacements of the initial assets) or these assets themselves may be sold to the financier. *Under present law, a filed tax lien has priority over the rights of the lender or purchaser if the funds are not*

It follows, then, that Amboy, like the Bank in *Fletcher,* "lost its priority lien status on [August 27, 2005] which is the 46th day following the [July 12, 2005] filing notice of the first tax lien on the real property here in question." *Fletcher,* 342 F. Supp. 2d at 1012. If, however, there were any further disbursements on the HELOC in the grace period, July 12–August 26, 2005, they would take priority over the federal tax lien. The record does not disclose whether there were any disbursements within the grace period.

### 4. Repayments/interest and fees

Another factor in determining priority will be the extent to which loan disbursements made before Amboy lost its priority status (*i.e.,* before August 27, 2005) were repaid by the Balices.

---

advanced, or the security purchased, until after the tax lien filing.* In addition, it has priority under present law if the initial assets are replaced with assets acquired after the tax lien filing. As a result, under present law for a lender or purchaser to be sure that no tax lien has recently been filed, he must search the records each time before making an additional advance or purchase. The provision added by the bill is designed to keep this obligation within practical bounds by giving the interests arising under the agreements providing for these loans or purchases priority over a filed tax lien if the loans or purchases are made not later than 45 days after the tax lien filing and before the lender or purchaser has actual notice of the filing.

S.Rep. No. 1708, 89th Cong., 2d Sess., reprinted in 1966 U.S. Code Cong. & Admin. News, pp. 3722, 3729 (emphasis added); quoted in *Rice Inv. Co. v. United States,* 625 F.2d 565, 569 (5th Cir. 1980).

Of course, the 45-day period reflects the reality that there must be *some* cutoff, after which the mortgagee's rights yield to those of the government. In imposing a cutoff date, Congress surely had it in mind that the IRS, unlike a mortgagee bank, is an involuntary creditor:

When two private lenders both exact from the same debtor security agreements with after-acquired-property clauses, the second lender knows, by reason of the earlier recording, that that category of property will be subject to another claim, and if the remaining security is inadequate he may avoid the difficulty by declining to extend credit. The Government, by contrast, cannot indulge the luxury of declining to hold the taxpayer liable for his taxes; notice of a previously filed security agreement covering after-acquired property does not enable the Government to protect itself.

*United States By & Through I.R.S. v. McDermott,* 507 U.S. 447, 454-55 (1993).

Amounts lent and repaid before the cutoff date of August 27, 2005, are an obvious case. If the Balices had borrowed on the line of credit, and fully paid off the debt before the tax lien took priority, the priority of Amboy's lien would not be an issue. Amounts lent before the August 27, 2005 cutoff date, but repaid after that cutoff date, may also be relevant. All other things being equal, the priority lien cannot secure an amount greater than what is actually owed on the pre-tax-lien debt.

Finally, I have not addressed the issue of interest and fees on the debt. These, too—at least to the extent they arise from loan disbursements made prior to the cutoff date—may figure into the amount of the lien. But they cannot be calculated from the record now before the Court.

The issues of repayment, interest, and fees, may be essential to the calculation of the amount of Amboy's lien and the extent of its priority. They should be explored in discovery and addressed in any subsequent motion for summary judgment.

### 5. Factual issues preclude summary judgment

At least three sets of factual issues make entry of summary judgment inappropriate. These include 1) the balance that the Balices owed to Amboy on August 26, 2005; 2) how much of that debt, if any, the Balices repaid; 3) interest and fees.

The only evidence submitted as to the amount of the lien before the cutoff date is a statement in an affidavit (without supporting records) that the "principal balance" as July 12, 2005, was $34,592.43.[11] (Koreyva Cert. ¶ 7). Disbursements in the grace period, if any, are not revealed, and repayments by the Balices are not established with any certainty. Nor are interest and fees calculated. The government contends that it has not had sufficient discovery. (Dkt. No. 38-1, ¶ 5) I agree that no determination as to the amount of Amboy's lien should be made without discovery of the underlying financial records. *See*

---

[11]    This dollar figure raises the possibility that very little money is actually at stake in this priority dispute. I leave that issue for another day.

*generally* FED. R. CIV. P. 56(d) (where nonmovant demonstrates that, for sufficient reason, it lacks facts essential to its opposition, the court may permit additional time for discovery).

Summary judgment will therefore be denied for the present. Any subsequent summary judgment motion on Amboy's priority should be withheld until discovery has place the parties in a position to address the issues discussed in this Section.

## II.   **Motion to dismiss based on res judicata (Dkt. No. 6)**

In two prior actions, the government reduced to judgment the Balices' tax debts for 1992, 1993, 1996, and 2001. (Dkt. No. 6, ¶ 6) Under principles of *res judicata*, Balice argues, those prior judgments bar the government from proceeding with this action. (Dkt. No. 6, ¶ 6) The argument is not correct.

When a court considers whether to give preclusive effect to a prior judgment, it must ascertain the preclusive effect of that judgment under the law of the prior court. *Peloro v. United States*, 488 F.3d 163, 175 n. 11 (3d Cir. 2007). Where, as here, a federal court is considering the prior judgment of another federal court applying federal law, then the applicable preclusion principles are unquestionably federal-law principles. *Peloro v. United States*, 488 F.3d 163, 175 n. 11 (3d Cir. 2007). *See also* WRIGHT & MILLER, 18B FED. PRAC. & PROC. JURIS. (2d ed.) § 4466, *Res Judicata Between Federal Courts*. Under federal law, a prior judgment should be given preclusive effect where "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *Peloro*, 488 F.3d at 175.

The issues in this action are not the same ones decided in the government's prior federal actions against the Balices.

First, the two prior cases involved entirely separate years. In one case, No. 07-5326 (D.N.J.), the court entered judgment against Michael Balice for

17

taxes owed for 1990, 1992, 1993, 1996, and 2001. (*See* Hochberg Order, 2) In a second case, No. 11-cv-130 (D.N.J.), the court entered judgment against Marion Balice for the years 1992, 1993, 1996, and 2001. (Chesler Order, 1, 3) The government's claims in this cover tax years 1998 and 2005 (Compl. ¶¶ 17, ¶ 22) The current claims (Counts I and II) do not overlap with the prior ones, and therefore are not subject to preclusion.

The government is also seeking relief that it did not seek in the prior actions: it wants to foreclose on the Maple Drive property. (Compl., Counts IV-V) Balice is of course correct that this foreclosure action is premised in part on the prior tax judgments against the Balices. (*See* ¶¶ 40, 42) But the prior actions were not foreclosure actions. Rather, those prior actions established the Balices' liability for tax assessments and entered money judgments, resulting in the attachment of tax liens to all property and rights that the Balices owned. *Id.* at ¶ 44. *See* 26 U.S.C. §§ 6321-22 (providing that if a person refuses to pay taxes for which they are liable, the amount due becomes a lien in favor of the United States which lasts until the amount is paid).

Even as to the tax years covered by the prior cases, then, this action asserts a separate cause of action: foreclosure. The current action alleges that, judgments having been entered, the Balices have failed to pay the earlier judgments. And it seeks a sale of property to satisfy the earlier judgments (as well as judgments for two additional tax years that are sought here).

If Balice's *res judicata* argument were correct, no creditor could ever sue for foreclosure based on a prior judgment. That clearly is not the case; very often a lien on property will be based on a prior judgment. *See* 1 THE LAW OF DEBTORS AND CREDITORS § 6:43 ("[I]n all states except Kentucky and Michigan, and in all the New England States other than Connecticut, a judgment may result in a lien in real property, or even in the personal property, of the debtor after compliance with certain statutory procedures."). To say that a prior judgment precludes foreclosure would in many cases defeat the very purpose of

a foreclosure action. I therefore decline to adopt that interpretation, and will deny Balice's motion.

### III.   Motions to dismiss for lack of jurisdiction, lack of standing, and lack of constitutional authority to legislate (Dkt. Nos. 7, 8, 26, 27, 36, 47, 49)

Balice has filed a series of motions titled as motions to dismiss for lack of standing, jurisdiction, and constitutional authority. All rely on a common sequence of arguments: The Constitution does not give Congress the power to collect income taxes; even if such authority exists, Congress may not delegate it to the Executive branch; and therefore the Executive branch has no authority to bring this action. Any law Congress has passed authorizing the collection of taxes, Balice says, is invalid, and this Court therefore lacks all jurisdiction to hear this case. I disagree with all of these arguments, and will deny Balice's several motions.

#### a. Congress's power to tax

The Sixteenth Amendment to the U.S. Constitution provides that "[t]he Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration." U.S. CONST. amend. XVI. Balice points out that the Amendment does not contain an "enforcement provision." (Dkt. No. 15, ¶ 20; Dkt. No. 26, ¶ 13). Therefore, he says, Congress has no authority to pass legislation concerning the collection of taxes, and this Court can have no jurisdiction. (Dkt. No. 36, ¶ 11)

True, the Sixteenth Amendment lacks a separate "enforcement provision." That is, it does not contain a statement that "Congress shall have power to enforce this article by appropriate legislation," like the ones found in, for instance, the Thirteenth, Fourteenth, Fifteenth, Eighteenth, and Nineteenth Amendments. But those Amendments contain an enforcement provision for a particular reason: their substantive provisions do not themselves confer power

19

upon Congress, but on the citizenry. For instance, the Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. CONST. AMD. XV. If the drafters of the Fifteenth Amendment had simply left it at that, it could be argued that they had failed to grant Congress the authority to pass laws concerning discrimination in voting.[12] Thus, the Amendment explicitly grants Congress the power to enforce the rights it granted to the citizens.

In the Sixteenth Amendment, though, no such clause was necessary. The substantive language of the Sixteenth Amendment itself confers power on Congress: "The Congress shall have the power to lay and collect taxes on incomes..." Once vested with this power, under the Necessary and Proper clause Congress could pass legislation to implement that power. *See* U.S. CONST. art. I, § 8 ("Congress shall have Power...To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other power vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."). Thus, no separate enforcement clause is necessary.

Under Balice's reading, the Sixteenth Amendment, although it provides that "Congress shall have power" to lay and collect taxes, would remain a dead letter. It is difficult to imagine how Congress might exercise that "power" unless through legislation. Balice's interpretation is illogical, and I reject it.

### b. Congressional power to delegate to the Executive

In the alternative, Balice argues that even if the Sixteenth Amendment authorizes Congress to collect taxes, it does not authorize the Executive branch

---

[12]   Whether such authority could be found elsewhere is a separate issue, which I do not discuss.

to do so. (Dkt. No. 7, ¶ 5; Dkt. No. 26, ¶ 8) Nor, Balice says, may Congress delegate its collection authority to another branch of the government. (Dkt. No. 8, ¶ 11; Dkt. No. 26, ¶ 11) Balice relies on a similar line of argument to suggest that institutions of the Executive branch (such as the Department of Justice and the IRS) do not have "standing" to bring suit to collect taxes. (Dkt. No. 8, ¶¶ 2, 10; Dkt. No. 26, ¶ 30).

It is true that the Constitution confers the power to collect taxes on the Congress. U.S. CONST. amend. XVI. However, under the Necessary and Proper Clause, Congress may pass laws necessary and proper to effectuate its enumerated powers. U.S. CONST. art. I, § 8. And in this sphere, as in many others, Congress exercises its powers by means of the Executive branch.[13]

It is long past dispute that Congress may pass laws delegating the exercise of its authority to a government agency. That delegation power requires that Congress guide the Executive's discretion. But "so long as Congress provides an administrative agency with standards guiding its actions such that a court could ascertain whether the will of Congress has been obeyed, no delegation of legislative authority trenching on the principle of separation of powers has occurred." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989) (citing *Mistretta v. United States,* 488 U.S. 361, 379 (1989)). Where Congress has "clearly delineate[d] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority," the Constitutional requirements of separation of powers are satisfied. *Skinner*, 490 U.S. at 214 (citing *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). Thus, Congress may delegate the power to collect taxes to the IRS, so long as its legislation articulates adequate standards to govern the agency's actions.

Congress's delegation of the power to collect taxes meets this threshold. After delegating the power to collect taxes to the Secretary of the Treasury (26

---

[13]     Were it not so, individual Congressmen and Senators would presumably have to go door to door to collect taxes.

U.S.C. § 6301), Congress imposed standards for the agency's collection activities through the tax code. To take a few random examples, Congress has:

- restricted the actions the Secretary may take in communicating with taxpayers (26 U.S.C. § 6304)
- prohibited the Secretary from harassing or abusing taxpayers. 26 U.S.C. § 6304(b)
- specified procedures the Secretary must undertake in order to place a lien on a taxpayer's property (26 U.S.C. § 6330)
- specified that the Secretary must notify a taxpayer within 60 days when an assessment has been made against the taxpayer (26 U.S.C. § 6303)
- ordered the Secretary to set a due date for tax payments (26 U.S.C. § 6151) and allowed the Secretary to extend that period for up to one year (26 U.S.C. § 6161)
- enumerated time limits for entities to deposit their tax payments (26 U.S.C. § 6302(e)-(f))
- specified that the Secretary should set up a system to collect taxes via electronic funds transfer (26 U.S.C. § 6302(h))

Through these and thousands of other requirements, Congress has delineated the scope of the Secretary's discretion in sufficient detail to make the delegation constitutionally sound. Indeed, courts have upheld delegations of authority far less detailed than the tax code, which is proverbially intricate. As the *Skinner* decision recounted, the Court has upheld delegations such as:

> *Lichter v. United States*, 334 U.S. 742, 778–786 (1948) (upholding delegation of authority to War Department to recover "excessive profits" earned on military contracts); *Yakus [v. United States]*, 321 U.S. [419], 426–427 (1944) (upholding delegation of authority to the Price Administrator to fix prices of commodities that "will be generally fair and equitable and will effectuate the purposes" of the congressional enactment); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 600–601 (1944) (upholding delegation to Federal Power Commission to determine just and reasonable rates); *National Broadcasting Co. v. United States*, 319 U.S. 190, 194, 225–226 (1943) (upholding delegation to the Federal Communications Commission to regulate broadcast licensing as "public interest, convenience, or necessity" require).

*Skinner*, 490 U.S. at 214.

22

In delegating its collection authority to the IRS, Congress complied with the Constitutional requirement of separation of powers. I therefore deny Balice's motions to the extent that they challenge Executive branch involvement in the tax collection process.

### c. Standing

Likewise, Balice's motions to dismiss for lack of standing (Dkt. Nos. 8 and 27) will be denied. Balice argues that the Department of Justice and the IRS do not have standing to bring this suit. The plaintiff in this case is, of course, the United States, not the Department of Justice or the IRS.

The United States has standing to bring suit to collect taxes. "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotations and alterations omitted). The United States has alleged an injury (lost income from taxes not collected). It has alleged a clear connection between that injury and Balice's failure to pay the taxes he owed. And that injury can be redressed by the relief sought: the United States seeks to foreclose on a property to satisfy the tax obligation that is owed. Indeed, federal law specifically provides the government with a cause of action to recover unpaid taxes. *See* 26 U.S.C. § 7403(a) ("In any case where there has been a refusal or neglect to pay any tax...Attorney General...may direct a civil action to be filed in a district court of the United States to enforce the lien...or to subject any property...of the delinquent...to the payment of such tax or liability."). Thus, the United States has met the requirements for standing to bring suit in federal court. And because it was proper for Congress to delegate its authority to the Executive branch, *see* Part III.b *supra*, there is no problem with the government's using the services of the IRS, or being represented in this action by the Department of Justice.

In back of all of Balice's standing arguments is the contention that the Sixteenth Amendment does not give the Executive branch (or for that matter, the Congress) the constitutional authority to collect income taxes. I repeat that this argument is not correct. Balice's motions to dismiss for lack of standing therefore will be denied.

### d. **Default Judgment (Dkt. Nos. 47, 49)**

Balice has filed a motion for default judgment. (Dkt. Nos. 47, 49) He does not refer to a default judgment in the usual sense; he means that the Government lacks all authority to collect taxes, and that judgment should therefore be entered in his favor. For the reasons expressed above, the government does indeed have authority to collect taxes. Moreover, it has properly appeared in this action, and it has not defaulted. I will therefore deny Balice's motion for a default judgment.

### IV.   **"Motion for due process" (Dkt. No 14)**

Balice is currently incarcerated at a federal prison in Fort Dix, New Jersey.[14] (Dkt. No. 14, ¶ 2) His imprisonment, he says, hampers his efforts to defend this civil case, which is a "complex and complicated legal action." *Id.* at ¶¶ 4-5. In particular, Balice has asked this Court to order the Bureau of Prisons to provide him with access to prison telephones for one hour per weekday. *Id.* at ¶ 6. According to the government, inmates are allotted fifteen minutes of telephone access per day. (Dkt. No. 18, 1)

The government argues that Balice's request should be denied because he has not exhausted the grievance procedures within the Bureau of Prisons

---

[14]    On June 20, 2011, after a jury trial, Balice was found guilty of conspiracy to defraud the United States, eight counts of wire fraud, and tax evasion for tax year 2007. *United States v. Balice et al.,* 10-cr-00485, Dkt. No. 203). On December 21, 2011, he was sentenced. (Judgment, Dkt. No. 232). Balice received concurrent sentences of 48 months' imprisonment on all counts. (*Id.*; *see also* Amended Judgment, Document 262, filed Jan. 10, 2013).

system. (Dkt. No. 18, 4-5) There may be merit to that contention. Nevertheless, I reach the merits and deny the motion because Balice has not established any entitlement to—or even a need for—the telephone access he requests.

Balice's claim of legal entitlement to telephone access is feeble. Most commonly, such claims are asserted by criminal defendants who seek to defend against criminal charges, attack their convictions, or challenge conditions of confinement. In a criminal case, the claim may implicate the Sixth Amendment right to counsel. But even where, as here, it is allegedly grounded in due process, a viable telephone access claim is largely confined to criminal matters, and to direct communications with attorneys.

Judge Kugler of this Court has usefully summarized the governing law:

> The right of access to the courts derives from the First Amendment right to petition and the due process clauses of the Fifth and Fourteenth Amendments. The right of access to the courts requires that "adequate, effective, and meaningful" access be provided to inmates wishing to challenge their criminal charge, conviction, or conditions of confinement. *See Bounds v. Smith*, 430 U.S. 817, 822 (1977). Prison officials must "give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the Courts." *Id.* at 825.

However, as the Supreme Court explained:

> ... *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U.S. 343, 355 (1996).

> Moreover, a prisoner alleging a violation of the right of access must show that prison officials caused previous or imminent "actual injury" by hindering efforts to pursue such a claim or defense. *See Lewis*, 518 U.S. at 348–51, 354–55; *Oliver v. Fauver*, 118 F.3d 175, 177–78 (3d Cir.1997).

*Peterson v. Holmes*, 2012 WL 5451435, at *6 (D.N.J. 2012).

Such challenges are routinely rejected. In particular, the courts have dismissed out of hand alleged restrictions on telephone access to persons other than the inmate's attorney. *Royal v. Rochford,* 2012 Wl 259388, at *7 n.6 (D.N.J. 2012) (citing *McFarland v. Luttrell,* 1995 WL 150511, at *4 (6th Cir. 1995)). Balice's claim has no firm legal foundation.

But even indulging Balice's legal theory, I find that he has not established that denial of one hour of telephone access per day, under the circumstances of his case, violates any established legal right. And he certainly has not established that it has resulted in any "actual injury."

Balice says he needs more telephone time to coordinate his presentation of evidence with that of the other seven defendants. (Dkt. No. 25, ¶ 5; Dkt. No. 14, ¶ 5(b) It appears, however, that none of the other seven defendants has a role in this litigation that would require Balice to communicate extensively with them. Nor does it appear that alternative forms of communication, such as written correspondence or shorter phone calls, would be inadequate.

One of Balice's codefendants, Marion Balice, has entered into a settlement with the government, and a consent judgment has been entered against her. She is out of the case. (*See* Dkt. No. 56) Two other defendants, Medical Care Management and Richard Tiedmann, have failed to appear or otherwise defend this action. (I will be entering a default judgment against them. *See* Part VIII, *infra*.)

Three of the four remaining defendants are banks that held a mortgage on the Maple Avenue property or recorded a judgment against Balice. (Compl., ¶¶ 8, 9, 12) If anything, they are adverse to Balice. (In some cases, they are adverse to the United States as well, but not in any way that would aid Balice.) Balice has demonstrated no pressing need to coordinate his litigation efforts with theirs by means of lengthy telephone calls.

Defendant Barclays Bank has stipulated that it has no interest in the Maple Avenue property. Barclays does not intend to "participate in any further proceedings in this case." (Dkt. No. 45, ¶¶ 2-3)

26

Defendant Investors says it holds a mortgage lien on the Maple Avenue property that is superior to those of the United States and Amboy Bank. (Dkt. No. 64) (The United States has conceded as much. (Dkt. No. 65)) Defendant Amboy Bank, as discussed above, asserts that its lien on the Maple Avenue property is superior to that of the United States. (Dkt. No. 63) Balice has no interest in vindicating the positions of Investors or Amboy; the banks, for their part, are presumably indifferent to the fate of junior debt. Balice has thus demonstrated no particular need to "coordinate" with the banks. In particular, he has not shown that written correspondence and phone calls of 15 minutes per weekday would not be sufficient.

The only remaining defendant is The Rosewater Trust. According to the government, Rosewater is a nominee; Balice allegedly transferred his interest in the Maple Avenue property to Rosewater for no consideration, to defeat creditors. (Compl., ¶ 29) The government alleges that Balice himself created The Rosewater Trust and serves as its Trustee. *Id.* at ¶ 28. From the record before me, then, Balice does not need extensive telephone access to "coordinate" with Rosewater.

Balice argues that he also needs to coordinate with "personal advisors, counsel, and paralegal staff in preparing [his] defense." (Dkt. No. 14, ¶ 5(a)) Balice is not represented by counsel and, so far as the Court is aware, he employs no paralegals. *Id.* Nor has Balice identified any "personal advisors" or explained why such advisors could not communicate with Balice in writing or in daily 15 minute telephone conversations.

Balice has shown no particular need for additional telephone access. Still less has he demonstrated that the limits on his telephone access have denied him due process. I will deny his motion.

## V.   Objection to the Appointment of a Magistrate Judge (Dkt. No. 66)

When the government filed its complaint, this case was assigned to me as District Judge. It remains assigned to me.

At the time of filing, United States Magistrate Judge Madeline C. Arleo was assigned to assist me. On her appointment to the District Court bench, her place was taken by United States Magistrate Judge Steven C. Mannion. (*See* docket entry on September 8, 2014). On June 2, 2015, the case was again reassigned, this time to United States Magistrate Judge James B. Clark. (*See* docket entry on June 2, 2015). After this last reassignment, Balice filed an objection to the appointment of any Magistrate Judge. I will deny his motion.

Balice seems to believe that the entire matter has been placed in the hands of Magistrate Judge Clark. He points out that, absent consent of the parties, only a District Judge may hear a suit of this nature. To be clear, I remain the presiding District Judge. In our district, when a case is assigned to a District Judge, it is also assigned to a Magistrate Judge, who may assist with discovery issues, certain non-dispositive motions, and general case management. That is what was done here.[15]

The Magistrate Judge's role is invaluable and much appreciated, but not exclusive. I, as the District Judge assigned to the case, will continue to preside. Absent consent of the parties, I will decide dispositive matters. I read Balice's motion to be based on a simple misunderstanding of the Court's docket entries. In any case, I will deny it.

## VI.   Objections to Plaintiff's motion for time to submit a motion for summary judgment (Dkt. Nos. 68 & 70)

Balice has filed two motions (Dkt. Nos. 68 and 70) objecting to "Plaintiff's Motion for Time to Submit Motion for Summary Judgment." Balice does not cite the "motion for time" to which he is referring. I believe the reference is to a status letter (Dkt. No. 65) that the government filed at the request of Magistrate Judge Clark. In that letter, the government speculated that it "may be able to move for summary judgment without the need for discovery." (Dkt. No. 65, 3) It has not, however, actually made such a motion or sought leave to do so.

---

[15]     Local Rule 72.1 provides a more detailed description of the duties that Magistrate Judges perform in this District.

Balice argues that the United States should not be allowed to move for summary judgment in advance of further discovery. I will not rule on a speculative basis. Balice may make his argument if the United States does in fact file, or seek to file, a motion for summary judgment.

In these motions, Balice asserts two other arguments: 1) that the Constitution gives him an absolute right to a jury trial, and 2) that there are disputed issues of material fact that preclude summary judgment. These anticipatory arguments, too, are more properly made in opposition to any motion for summary judgment that is filed by the United States.

I will therefore deny Balice's motions (Dkt. Nos. 68 and 70) without prejudice to renewal of these arguments at the proper time.

## VII.   Objection to *ex parte* communications (Dkt. No. 69)

Balice has filed a motion objecting to what he characterizes as wrongful *ex parte* communications. Balice appears to be referring to a sentence in a status letter filed by the United States, reporting that: "On May 21, 2015, the United States conducted a telephonic conference under FED. R. CIV. P. 26(f). Although all parties were invited to attend, only Amboy Bank and Investors Bank participated." (Dkt No. 65, 3) It does not appear, and Balice does not suggest, that any representative of the Court was involved in the call.

A forbidden *ex parte* communication might be one party's substantive communication with the presiding judge, judge's substantive communication, outside the presence of its adversary and without consent or legal authorization. By extension, the term might refer to an attorney's direct communication with an opposing, represented party outside the presence of that party's attorney. *See* Rule of Professional Conduct 4.2.

Balice has alleged no forbidden *ex parte* communication here. Balice cites no authority suggesting that a plaintiff's attorney in a multi-defendant case may not communicate with defendants' attorneys one at a time. (I make no finding as to whether, as the government states, Balice chose to opt out of the required Rule 26(f) discovery conference among the parties.)

29

Balice has asked that the Court (1) issue a restraining order prohibiting the United States from any further contact with any of the other defendants in this matter (Dkt No. 69, ¶ 20), and (2) set aside "whatever agreement has been made between the Plaintiff United States and the other involved defendants in this action" as a result of the May 21 call. *Id.* Because the call was not *ex parte* or improper, I will deny each of those applications.

## VIII.  Government Motion for default judgment; Balice Motion to void the entry of default (Dkt. Nos. 52, 58)

The Clerk has entered defaults against defendants The Rosewater Trust, Richard Tiedemann, and Medical Care Management System. The United States has moved for a default judgment against those three defendants. None of the three has entered an appearance or otherwise defended the case. Balice moves to void the Clerk's entry of default on the general ground, discussed above, that the Court allegedly lacks jurisdiction to hear a tax case. (Dkt. Nos. 52, 58)

The Third Circuit has expressed a strong preference for deciding cases on the merits. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984) For instance, when a litigant asks that a previously entered judgment of default be set aside, the Third Circuit has instructed that "any doubt should be resolved in favor of the petition to set aside the judgment so that cases may be decided on their merits." *Medunic v. Lederer*, 533 F.2d 891, 894 (3d Cir. 1976). Default judgments are therefore generally disfavored. *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984).

Against that backdrop, courts consider three factors in deciding whether to enter a default judgment: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000).

I first consider defendants Richard Tiedemann and Medical Care Management System. According to the complaint, those defendants had previously obtained judgments against Balice. (Compl., ¶¶ 10-11) The

30

government therefore named them as defendants because they might assert an interest in the Maple Avenue property, should the government foreclose on it. Indeed, the government had little choice but to do so. *See* 26 U.S.C. § 7403(c) (providing that "[a]ll persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto"). As it happens, however, Tiedemann and Medical Care have not come forward to assert any interest in the Maple Avenue property. Both were served with the summons and complaint. No reason for their failure to appear (other than the lack of any legal or equitable interest worth pursuing) appears in the record. I therefore find that a default judgment is appropriate as against defendants Richard Tiedemann and Medical Care Management System.

With respect to defendant The Rosewater Trust, however, a default judgment is not appropriate. The Complaint does not allege that the Trust is delinquent in tax payments. It alleges only that the Balices transferred the Maple Avenue property to the Trust, which is now the record owner of the property. (Compl., ¶ 29) Issues concerning the Trust's interest may be addressed in connection with foreclosure, should that occur; there is no prejudice to the government if a default is not entered at this time.

I am also disinclined to exercise my discretion to enter a default judgment against the Trust. The government asks for an immediate judgment declaring that the Trust has no true interest in the property, but is merely Balice's nominee or alter ego. (Compl., ¶¶ 29-30) Although the Trust has not appeared, Balice himself contests these facts. (*see* Balice Answer ¶¶ 11-13) I cannot enter judgment against the Trust without prejudging Balice's contentions. I therefore decline, at least at present, to enter a default judgment against The Rosewater Trust.

Balice has also moved to void the Clerk's entry of default against Tiedemann, Medical Care Management, and Rosewater Trust. (Dkt. Nos. 58, 61) The basis for his objection is that the Court has no jurisdiction to hear this tax case. I have already considered and rejected Balice's arguments on that score. Balice also objects that the Clerk did not allow him to file an opposition

to the government's request for default. (Dkt. No. 58, ¶ 12) The default, however, was not sought against Balice. At any rate, to the extent Balice's rights may be implicated, he has asserted them in these motions; indeed, it is largely for his protection that I have denied entry of a default judgment against the Trust. Balice's motion to void the Clerk's entry of default is denied.

## **Conclusion**

Amboy Bank's motion for summary judgment (Dkt. No. 33) is denied. Although Amboy's lien would have priority over the tax lien of the United States as to loan disbursements on or before August 26, 2005, the amount of the lien and the extent of its priority cannot be determined without further discovery and the resolution of various issues of fact.

The following motions brought by defendant Balice are denied: Motion to dismiss on grounds of res judicata (Dkt. No. 6); motion for due process (Dkt. No. 14); objection to the appointment of a magistrate judge (Dkt. No. 66); motion to void the Clerk's entry of default (Dkt. No. 58); miscellaneous motions challenging the authority of Congress or the Executive branch to collect taxes (Dkt. Nos. 7, 8, 26, 27, 36, 47, 49); motion objecting to what Balice describes as the government's motion for time to submit a motion for summary judgment (Dkt. Nos. 68 & 70); motion objecting to what Balice characterizes as *ex parte* communications between the government and other defendants (Dkt. No. 69).

The motion of the United States for a default judgment (Dkt. No. 52) is granted as to defendants Richard Tiedemann and Medical Care Management System, but denied as to The Rosewater Trust.

To be clear, the remaining defendants are Michael Balice, Amboy Bank, Investors Bank, and The Rosewater Trust. A separate order will issue.

July 10, 2015
Newark, New Jersey

Kevin McNulty
United States District Judge

33